**Bill E. JOHNSON, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 96–49.

Supreme Court of Wyoming.

April 16, 1997.

Sylvia L. Hackl, State Public Defender; Donna Domonkos, Appellate Counsel; and Deborah Cornia, Assistant Appellate Counsel, for Appellant.

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Georgia L. Tibbetts, Assistant Attorney General, for Appellee.

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN and LEHMAN, JJ.

MACY, Justice.

Appellant Bill Johnson appeals from the judgment and sentence which the district court entered after the jury found that he was guilty of two counts of aggravated assault and that he was a habitual criminal.

We affirm.

## ISSUES

Appellant requests our review of the following three issues:

*Issue I*

Did the trial court err when it permitted the State to use prior bad acts against the Appellant in order to obtain a conviction?

*Issue II*

Did the trial court err when it admitted the hearsay testimony of Officer Cook?

*Issue III*

Was Appellant denied effective assistance of counsel due to trial counsel's deficient performance?

## FACTS

The victim became acquainted with Appellant in October of 1993. Over the next year and a half, they developed a close relationship and eventually bought a house together. On May 26, 1995, the victim and Appellant moved the victim's belongings into the house which they had purchased.

On May 30, 1995, Appellant showed the victim some marks on his arm which looked like he had "shot himself up with something."

Appellant told the victim that he was ashamed of what he had done but assured her that it would not affect his behavior toward her. However, on May 31, 1995, Appellant began accusing the victim of taking part in various offensive activities; i.e., belonging to a satanic cult, having affairs with other men, flashing his construction crew, having sex with young children, having sexual feelings toward his thirteen-year-old daughter, and having duplicate keys made for her strong box to give to the members of her satanic cult. When the victim denied Appellant's accusations, Appellant became violent. Appellant got angry when the victim denied having duplicate keys made to the strong box, and he took her into the spare bedroom where he heated the key with his lighter. He threatened to brand her with the hot key if she did not tell him the truth. Although the victim attempted to reassure him that his suspicions were unfounded, Appellant placed the hot key on her arm, causing her skin to burn and blister. Appellant rubbed the burn with a tissue until he had wiped away the burned skin. He then threatened to brand the victim's tongue and forehead with the key and to cut off her nose.

Appellant typed the victim's name on his computer and told her that, with the push of a button, he could have her killed and that nobody would ever know what happened or how it happened. Appellant also told the victim that he could arrange to have a neighbor with whom he had accused her of having an affair and her parents killed by putting their names into the computer.

The victim went to bed, but Appellant would not let her go to sleep. Instead, he continued making accusations. When the victim denied them, Appellant slapped her and choked her several times by placing his thumbs on her throat. Appellant then punched the victim several times on both sides of her head and told her that she could avoid the beating if she would tell him the truth. Appellant forced the victim down to the floor and held a lit cigarette close to her right eye, threatening to burn her eye out. When the victim got back into bed, Appellant took a knife out of his pocket and held the blade against her throat. He put his finger in her vagina and threatened to rip her to her bellybutton so that she could never have sex with anybody else.

The next day, the victim left the house and went to the hospital to visit her daughter-in-law and her grandson who had been born the previous morning. While the victim was at the hospital, Appellant called twice to speak to her. Shortly after the second call, Appellant showed up at the hospital, and he and the victim went to the hospital parking lot to talk. When the victim refused to go home with Appellant, he left the hospital, and the victim returned to her daughter-in-law's room where she stayed for a few more minutes. She then went to her parents' home and called the police.

The victim subsequently went to the police station and reported the assaults. Although she spoke with Chris Cook, a patrolman for the City of Sheridan, and provided a detailed account of the assaults, she did not report what had happened with the knife until about two weeks later. During that interview, Officer Cook noticed bruises above the victim's right eye, on her neck around the trachea area, and on her right forearm. He also noticed a burn on her left arm. Officer Cook asked Donna McCullough, a police officer with the Sheridan police department, to photograph the victim's injuries. While she was taking the photographs, Officer McCullough observed what appeared to be fingertip bruising on the victim's right forearm and neck and bruises on the victim's right cheek, her right temple, and the left side of her jawline. Officer McCullough also observed a burn on the victim's left forearm.

While the victim was at the police station, Appellant called to report a theft. He told Officer McCullough that some blank checks and $17,000 to $19,000 in cash had been stolen from his home and he suspected that the victim had stolen the items. When Officer McCullough asked Appellant to come to the police station to file a written report, Appellant declined to do so. Instead, he got a couple of beers and then drove up by Bozeman Rock where he spent the night. That evening, Officer McCullough tried unsuccessfully to contact Appellant to discuss the alleged theft as well as the victim's alle-

gations against him. When Appellant returned home on June 2nd, he was arrested for the assaults on the victim.

Throughout the proceedings, Appellant maintained his innocence, claiming that the victim had burned herself with a curling iron and had received the bruises from carrying boxes on the day that she moved into their new house. The jury found Appellant guilty of two counts of aggravated assault and of being a habitual criminal. The trial court sentenced Appellant to serve two concurrent terms in the Wyoming State Penitentiary of not less than ten years nor more than twenty years. Appellant appeals to this Court.

## DISCUSSION

### A. W.R.E. 404(b) Evidence

In Appellant's first claim of error, he contends that the trial court erred when it permitted the State to introduce evidence pertaining to a 1988 assault on his ex-girlfriend. The State argues that the evidence was properly admitted because it was relevant to proving motive, intent, and identity, purposes which are specifically sanctioned by W.R.E. 404(b).

It is important to note that Appellant does not claim that a procedural error occurred in the introduction of the evidence, nor does he allege that the evidence was inadmissible under the five-part balancing test which we articulated in *Dean v. State,* 865 P.2d 601, 606 (Wyo.1993).[1] Appellant's argument is limited to asserting that the evidence was more prejudicial than it was probative and that it was used to show his propensity to commit the crimes.

■ Our standard for reviewing the admissibility of other bad acts evidence provides:

Decisions regarding the admission or exclusion of evidence are within the sound discretion of the trial court. We extend appellate deference to a trial court's determinations regarding the admissibility of uncharged misconduct evidence. Only

manifest abuse of discretion will precipitate reversal in such cases, and so long as a consistent and legitimate basis for the trial court's ruling has been articulated, we will not find an abuse of discretion.

*Sturgis v. State,* 932 P.2d 199, 201 (Wyo. 1997) (citations omitted).

■ W.R.E. 404(b) governs the admissibility of other bad acts evidence:

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We recently reiterated the purpose of W.R.E. 404(b):

"Its intent is to avoid a demand that an accused defend acts of misconduct other than those charged in the indictment or information and to avoid potential confusion by members of the jury in addressing the issues of the case. The rule demands convictions are to be founded in those facts relevant to the crime or crimes charged. If the thrust of evidence of prior bad acts is only to demonstrate the defendant has a disposition to commit crimes, the evidence should be excluded."

*Daniel v. State,* 923 P.2d 728, 733 (Wyo.1996) (quoting *Wehr v. State,* 841 P.2d 104, 108 (Wyo.1992)).

On August 15, 1995, the State filed a notice pursuant to W.R.E. 404(b) of its intent to offer evidence of a similar assault on Appellant's ex-girlfriend which had occurred in 1988. The State planned to introduce the assault evidence as well as evidence of the physical injuries which the ex-girlfriend had sustained as a result of the assault. At the hearing, Appellant objected to the admissibility of the evidence, claiming that the prejudicial effect of the evidence outweighed its probative value and that the admission of

---

**1.** "The law regarding admissibility of W.R.E. 404(b) (Rule 404(b)) evidence concerning prior bad acts has recently been redefined and clarified in *Vigil v. State,* 926 P.2d 351 (Wyo.1996) and *Gunderson v. State,* 925 P.2d 1300 (Wyo. 1996)." *Sturgis v. State,* 932 P.2d 199, 202 (Wyo. 1997).

such evidence would serve only to inflame the jury. Following the hearing, the trial court found that the evidence would be admissible for the limited purposes of proving motive, intent, and identity.

At the trial, the ex-girlfriend testified that, while she was living with Appellant, he was heavily into drugs and was very paranoid and controlling. She testified that he had accused her of having multiple affairs, duplicating house keys to give to other men, and being involved with a satanic cult. She said that, when she denied his allegations, Appellant struck her numerous times with his fists, an axe handle, and a flashlight; that he kicked her several times in the mouth and pelvic area; and that he carved a cross and the words "In God We Trust in Jesus' Name" on her chest.

■ Appellant maintained throughout the trial that he was innocent. He argued that the victim used the details of the 1988 assault on his ex-girlfriend to falsely accuse him of assault to cover up the fact that she stole his money. Identity was, consequently, at issue. See Dean, 865 P.2d at 607; Longfellow v. State, 803 P.2d 848, 853 (Wyo.1990). We have held that evidence of other bad acts may be admitted for the purpose of proving identity. Dean, 865 P.2d at 607.

> "The probity of evidence of other crimes where introduced for this purpose depends upon both the uniqueness of the *modus operandi* and the degree of similarity between the charged crime and the uncharged crime. Of course, it is not necessary that the charged crime and the other crimes be identical in every detail. But they must possess a common feature or features that make it very likely that the unknown perpetrator of the charged crime and the known perpetrator of the uncharged crime are the same person. The more unique each of the common features is, the smaller the number that is required for the probative value of the evidence to be significant. But a number of common features of lesser uniqueness, although insufficient to generate a strong inference of identity if considered separately, may be

of significant probative value when considered together."

Pena [v. State], 780 P.2d [316,] 322 [ (Wyo. 1989) ] (*quoting United States v. Myers,* 550 F.2d 1036, 1045 (5th Cir.1977)) (citation omitted).

*Id.* Before evidence of other bad acts can be admissible to prove identity, the inference of identity flowing from the evidence must be extremely strong. *Id.* To prove identity from *modus operandi,* the crimes must " 'bear such peculiar, unique, or bizarre similarities as to mark them as the handiwork of the same individual.' " *Id.* (quoting *United States v. Myers,* 550 F.2d 1036, 1045–46 (5th Cir.1977)). Evidence which identifies the accused as being the person who committed the crime should, as a general rule, not be excluded merely because it tends to prove that the accused was guilty of a different crime. *Pena v. State,* 780 P.2d 316, 321 (Wyo.1989).

The trial court informed the jury that intent was at issue in this case by reading an instruction which stated that aggravated assault is a general intent crime. Professor Imwinkelried, a noted evidence scholar, explained:

> "[U]ncharged misconduct can be relevant and admissible to prove intent in both general and specific intent cases. This view is the trend in the case law and the predominate sentiment among the commentators. So long as the jurisdiction's substantive criminal law defines the charged crime as including even a general mens rea element, the prosecution must prove the existence of that mens rea beyond a reasonable doubt. The due process clause requires proof of all the essential elements of the crime by that standard. Moreover, under Rule 401, uncharged misconduct can unquestionably be logically relevant to prove a general mens rea.... [I]t is unsound to routinely exclude uncharged acts offered to prove a general mens rea for the stated reason that the acts are logically irrelevant."

*Mitchell v. State,* 865 P.2d 591, 599 (Wyo. 1993) (quoting EDWARD J. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE § 5.09 at 23 (1992 & Supp.1993)).

Motive was also at issue in this case given that "the prosecution is permitted to prove the accused's motive to identify the accused as the perpetrator of the charged crime." 865 P.2d at 596–97. According to Professor Imwinkelried:

"Motive is not an ultimate fact or element of the crime; rather it is an intermediate, evidentiary fact. The courts have variously described the concept of motive as the 'reason that nudges the will and prods the mind to indulge the criminal intent,' an 'inducement or state of feeling that impels and tempts the mind to indulge in a criminal act,' and 'the moving force which impels to action for a definite result.' While intent accompanies the actus reus, the motive comes into play before the actus reus. The motive is a cause, and the actus reus is the effect."

865 P.2d at 597 (quoting IMWINKELRIED, *supra*, § 3.15 at 35–36). He continued:

"[T]hat the defendant had a motive for that particular crime increases the inference of the defendant's identity. Many other persons presumably had no motive, and the defendant's motive raises the probability of defendant's identity.... It is ideal if the defendant is the only person with such a motive. At the other extreme, if the motivation is almost universal such as a general sexual desire, proof of the motive has little or no probative value on the issue of identity. In the motive cases ... the courts do not insist that the motive be truly unique to the defendant. The courts assume that motive has strong probative value because a motive naturally leads to action. If the motive is not universal but shared by many other persons, the courts tend to admit the proof of motive."

*Id.* (quoting IMWINKELRIED, *supra*, § 3.15 at 36).

■ W.R.E. 404(b) excludes evidence of crimes or acts when that evidence is offered solely to prove the bad character or criminal propensity of an accused. The rule, however, does not prohibit the use of other bad acts evidence to show that a defendant committed the charged actions, that he did so voluntarily, and that he had acted similarly on another occasion unless the prejudicial effect of the evidence outweighs its probative value. In *Elliott v. State*, 600 P.2d 1044, 1049 (Wyo.1979), we said:

The function of performing the comparisons required by Rule 403, W.R.E., generally is held to be discretionary with the trial court. The fact that the evidence is detrimental to the defendant is neutral. For the prejudice factor to come into play the court must conclude that it is unfair.

During *voir dire*, the defense counsel extensively questioned prospective jurors about potential biases they might have concerning the W.R.E. 404(b) evidence. Anyone who indicated that he had a predisposition to convict Appellant because of the prior assault was excused.

Furthermore, the trial court gave limiting instructions on at least two occasions with regard to the permitted use of the evidence. During *voir dire*, the trial court specifically informed the jury:

Occasionally the law allows evidence of other crimes, wrongs or acts in a case. But when that happens, that evidence is not admissible to prove the character of the Defendant, nor is it admissible to prove that he or she acted in conformity with that prior conduct. It may be admissible to prove other things, like motive, opportunity, intent, preparation, knowledge, identity. There are some other things like that. As a matter of law you absolutely would be prohibited from convicting a person of the crime charged merely because [he] had been convicted of some other crime at some other point in [his] life.

During the jury instruction phase of the proceedings, the trial court read the following instructions:

INSTRUCTION NO. 12

The testimony of [the ex-girlfriend] has been introduced for a limited purpose. You may consider that testimony for the purposes of evaluating the credibility of the testimony of [the victim]; to determine the identity of the perpetrator; the motive of the perpetrator; and/or to determine whether the acts were intentional.

INSTRUCTION NO. 13

Certain evidence was admitted for a limited purpose.

At the time this evidence was admitted, you were admonished that it could not be considered by you for any purpose other than the limited purpose for which it was admitted.

You are again instructed that you must not consider such evidence for any purpose except the limited purpose for which it was admitted.

■ Evaluating the evidence in this case in light of our earlier decisions, we cannot say that the danger of unfair prejudice outweighed the probative value of the evidence. Although the two assaults were not identical, their commonalities created a powerful inference that Appellant had committed both assaults. *See McDermott v. State,* 897 P.2d 1295, 1297 (Wyo.1995). The State's evidence in this case suggested that Appellant became delusional and paranoid from the use of drugs and that he was consequently violent toward the women with whom he lived. The W.R.E. 404(b) evidence was probative because it demonstrated that Appellant had previously used drugs and developed similar misconceptions about a live-in girlfriend which manifested in physical violence and resultant injuries. The evidence was probative of Appellant's identity, intent, and motive regarding the charged crimes. In addition, it served to rebut Appellant's claims that he did not commit the crimes and that the victim made the accusations, relying on the facts of the assault on his ex-girlfriend, to cover up the fact that she had stolen money from him. Given the substantial similarities between the two assaults as well as the precautions taken throughout the proceedings to limit this evidence, the probative value of the evidence outweighed any prejudicial effect, and the evidence was properly admitted.

**B. Hearsay**

Appellant asserts that plain error occurred when Officer Cook testified with regard to the statements which the victim had made to him, claiming that the statements were hearsay and, therefore, inadmissible. Appellant contends that he was prejudiced by the testimony because it added credibility to the victim's testimony.

■ Since no objection was raised to the challenged testimony, we must review this issue under a plain error analysis. Our plain error standard is well established:

" 'A three-part test has been established for determining whether an error may achieve the status of plain error. First, the record must be clear as to the incident which is alleged as error. Second, the party claiming that the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove that a substantial right has been denied him and as a result he has been materially prejudiced.' "

*Vigil v. State,* 926 P.2d 351, 357 (Wyo.1996) (quoting *Schmunk v. State,* 714 P.2d 724, 739 (Wyo.1986) (quoting *Bradley v. State,* 635 P.2d 1161, 1164 (Wyo.1981) (citation omitted))).

■ During its case-in-chief, the State called Officer Cook to testify. Officer Cook was involved with the investigation of this matter and had taken the initial complaint from the victim. The following is a recitation of the challenged testimony:

Q How did she say that she had incurred the burn?

A She had told me that [Appellant] had taken a key, a little small key that goes to a strong box belonging to her; he held the key above his lighter and then held it there for a few seconds and then placed it on her forearm.

Q Did she explain how she got the bruises on her neck?

A She said later on during the evening and early morning hours of the following day [Appellant] had been talking to her in the bedroom. She was lying on the bed. [Appellant] had straddled her and then had placed his thumb in her trachea area, the rest of the fingers on the side of her neck; and then would push down causing—restricting the air flow.

Q Did she provide you with any other details of what had happened?

A She said she had been struck several times in the face and head area, most of

the times with an open hand. One time she was punched in the face area. She also mentioned that [Appellant] had placed his finger on her temple, claiming that he could mash her brains by placing his thumb on her temple.

Q   Did she provide you with any other information about the assault?

A   She claimed—or she had told me that [Appellant] was upset with her, claiming she was having affairs; she was having orgies; she was in some type of a Satanic cult. And he also claimed that she was having an affair with a subject ... to which [the victim] denied.

Q   What did you do in the course of your interview with [the victim]?

A   Took a statement from her. Then I had Officer McCullough come in and take photographs of the bruises and the marks on [the victim].

Appellant relies on our recent opinion in *Kerns v. State,* 920 P.2d 632 (Wyo.1996), as support for his contention that this type of testimony was impermissible hearsay. In *Kerns,* a deputy sheriff testified about the conversations he had with a witness while he was investigating the case. 920 P.2d at 640–41. We held that the testimony was hearsay and was not necessary to explain the deputy sheriff's investigatory actions. 920 P.2d at 641. Such testimony, when offered only as general background of the investigation, did not add anything to the understanding of the remainder of the officer's testimony and was inadmissible hearsay. *Id.*

This case differs from *Kerns* in a material respect. Officer Cook's testimony ultimately offered an opinion regarding the specific nature of the victim's injuries. He testified that the bruising and burn which he had observed were inconsistent with Appellant's claims that the victim had incurred the bruises when she was moving boxes and that she had burned herself with a curling iron. The details of Officer Cook's conversation with the victim were, therefore, relevant in providing foundation for his opinion. Since the relevancy of the statements came from the mere fact that they were made rather than from their truth, the statements were not hearsay, and their admission did not violate a clear and unequivocal rule of law. *See* W.R.E. 801(c).

Even if the testimony had been inadmissible hearsay, Appellant has failed to demonstrate that he was materially prejudiced by the admission of this testimony. He maintains that the testimony added credibility to the victim's testimony. We disagree. The testimony simply reiterated what the victim had said to Officer Cook. It did not lend support to the truth of the allegations and thereby enhance the victim's credibility. Rather, the only fact that such testimony supported was that the victim had indeed made the statements. Furthermore, the victim had already testified in detail about the assaults. The challenged testimony from Officer Cook, therefore, was merely cumulative of the victim's previous testimony. The victim was extensively cross-examined, and the jury had a sufficient opportunity to assess her credibility. No reasonable probability exists that excluding the evidence would have led to Appellant's acquittal. *See Kerns,* 920 P.2d at 641.

## C.   Effectiveness of Counsel

Appellant asserts that he was denied his right to have effective assistance of counsel. Specifically, he claims that his trial counsel's representation was inadequate for the following reasons: his counsel failed to file a pretrial motion to suppress the statements which Appellant made to the police after he was arrested or to object to those statements being admitted at the trial; his counsel failed to cross-examine the interrogating officer with regard to the statements or request a theory-of-the-defense instruction which would advise that the statements had been involuntarily given; his counsel failed to object to the illegal search of Appellant's home and seizure of his computer; his counsel failed to object to the hearsay testimony presented by the State through the Officer Cook's testimony; his counsel failed to object to damaging W.R.E. 404(b) testimony; his counsel allowed the jury to hear cumulative testimony on uncharged misconduct which was introduced to the jury through the playing of portions of the preliminary hearing tapes; and his counsel failed to object to

statements which the prosecutor made during the State's closing argument.

■■■■■ "'The right of a criminal defendant to assistance of counsel is guaranteed by the Sixth Amendment of the Constitution of the United States, made applicable to the states through the Fourteenth Amendment and Wyoming Constitution Art. 1, § 10.'" *Owen v. State*, 902 P.2d 190, 198 (Wyo.1995) (quoting *Herdt v. State*, 891 P.2d 793, 796 (Wyo.1995)). The standard which this Court has followed in determining whether a criminal defendant has been denied the effective assistance of counsel was first established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, *reh'g denied*, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984)....

We examine the conduct of defense counsel in light of all the circumstances in determining whether the identified acts or omissions fall outside the ambit of professionally competent assistance, bearing in mind the function of counsel is to make the adversarial testing process work in every case. We do not evaluate the efforts of counsel from a perspective of hindsight but, rather, we endeavor to reconstruct the circumstances surrounding counsel's challenged conduct and evaluate the professional efforts from the perspective of counsel at the time. "We invoke a strong

presumption that counsel rendered adequate and reasonable assistance making all decisions within the bounds of reasonable professional judgment." *Gist [v. State]*, 737 P.2d [336,] 342 [ (Wyo.1987) ] (citations omitted). The burden is upon the defendant to overcome this presumption that, in light of the circumstances, the challenged action or failure of the attorney might be considered sound trial strategy.

*Dickeson v. State*, 843 P.2d 606, 609 (Wyo. 1992) (some citations omitted).

### 1. FAILURE TO FILE A MOTION TO SUPPRESS

■■■ Appellant claims that his defense counsel was ineffective because his counsel did not file a pretrial motion to suppress the statements which Appellant made to the police or object to the admission of those statements. Appellant also challenges his counsel's decision not to cross-examine the interrogating officer as well as his failure to request a theory-of-the-defense instruction to the effect that the statements were involuntary.

We agree with the State's observation that Appellant's ineffectiveness claim as it pertains to the voluntariness of the statements is premised on a bald assertion that his statements were involuntary and, therefore, inadmissible. Appellant does not enlighten us about why he claims his statements were involuntary nor does he explain how excluding that evidence would have altered the outcome of his trial.

We have recently considered the issue of whether failure to file a suppression motion constituted ineffective assistance of counsel. *Bloomquist v. State*, 914 P.2d 812 (Wyo. 1996); *Herdt*, 891 P.2d 793; *Starr v. State*, 888 P.2d 1262 (Wyo.1995), *overruled on other grounds by Jones v. State*, 902 P.2d 686 (Wyo.1995). In those cases, we held that failure to file a suppression motion did not constitute ineffective assistance of counsel *per se*. *Bloomquist*, 914 P.2d at 821; *Herdt*, 891 P.2d at 799; *Starr*, 888 P.2d at 1266. Instead, the reasonableness of counsel's challenged conduct must be analyzed from that counsel's perspective at the time of the alleged error and in the light of the surround-

ing circumstances. *Bloomquist,* 914 P.2d at 821; *Herdt,* 891 P.2d at 799.

Appellant's statements were generally exculpatory rather than inculpatory. The statements did not indicate that Appellant committed the charged crimes. Instead, Appellant completely denied that he had committed the assaults. His strategy did not include a defense that his statements were involuntary, and, had he done so, he undoubtedly would have undermined his case. Appellant sought to bolster his case by demonstrating to the jury that he was completely cooperative with the police during their investigation. We cannot fault his counsel's tactical decision to follow that path rather than challenging the voluntariness of the statements.

### 2. SEARCH AND SEIZURE OF COMPUTER

Appellant contends that his defense counsel's decision not to challenge the search of his residence and the seizure of his computer constituted ineffectiveness of counsel. We are puzzled by this contention because it appears from our perusal of the record that, contrary to Appellant's assertions, which do not include cites to the record, the State did not introduce or display the computer at the trial. In fact, a police officer testified that the computer was inoperative. In the absence of an explanation as to how the seizure of a computer which was not introduced at the trial prejudiced Appellant, we cannot find that his counsel's performance was defective.

### 3. HEARSAY TESTIMONY

Appellant complains that his defense counsel was ineffective because he failed to object to the hearsay testimony given by Officer Cook. As we discussed earlier in this opinion, those statements were not hearsay but were foundation evidence for the officer's opinions. Since such testimony did not constitute hearsay, his counsel did not act deficiently by failing to object to its admission.

### 4. OTHER BAD ACTS

Appellant maintains that his defense counsel was ineffective because he failed to object to his ex-girlfriend's testimony about the 1988 assault. This is also an issue which we discussed earlier in this opinion, and we held then that the challenged testimony was properly admitted for purposes which are specifically sanctioned by W.R.E. 404(b). Accordingly, his counsel did not perform deficiently by declining to object to the testimony.

### 5. PRELIMINARY HEARING TAPES

Appellant claims that his trial counsel improperly allowed the jury to hear cumulative evidence of other bad acts when portions of the preliminary hearing tapes were played. It is important to note that it was Appellant who requested that the tapes be played as he wanted to highlight an alleged discrepancy between the victim's trial description of the knife and her preliminary hearing description of the knife.

Appellant does not identify with precision what comments he is complaining about. Additionally, the testimony which was played was merely cumulative of the earlier testimony that had been given. His counsel's performance in this respect was not ineffective.

### 6. STATEMENTS MADE IN CLOSING ARGUMENT

Appellant's last claim of ineffective assistance of counsel is that his counsel should have objected to the prosecutor's reference during closing argument to Appellant's prior mental evaluations. Here, again, Appellant fails to explain to us how he was prejudiced by such references, especially since it was Appellant who first introduced the evidence in conjunction with his testimony about the 1988 assault. The prosecutor was entitled to comment upon that evidence and to draw reasonable inferences from it. *Chavez–Becerra v. State,* 924 P.2d 63, 69 (Wyo.1996). The failure to object to such comments, therefore, does not constitute ineffective assistance of counsel.

### 7. CUMULATIVE ERROR

Appellant contends that his defense counsel committed several errors which individually may have been harmless but amount to cumulative error when they are considered together. When no error has occurred, we cannot recognize a claim of cumulative error. *Hodges v. State,* 904 P.2d 334, 342 (Wyo.

1995). Appellant has failed to demonstrate that his counsel's performance was outside of the range of professionally competent assistance, and he has not shown that the outcome of his trial would have been different. We are confident that his counsel's performance was effective and did not compromise Appellant's defense. Since his counsel did not commit any underlying error, Appellant's claim of cumulative error cannot stand.

## CONCLUSION

The trial court did not err when it permitted the State to use prior bad acts evidence against Appellant, nor did it err by admitting the challenged testimony given by Officer Cook. Additionally, Appellant was not denied the effective assistance of counsel.

Affirmed.